## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MARK MULLERVY, | ) | |
| | ) | |
| Plaintiff / Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-00174-SGC |
| | ) | |
| CAH HOLDINGS, INC., *et al.*, | ) | |
| | ) | |
| Defendants / Counter-Plaintiffs. | ) | |

## MEMORANDUM OPINION & ORDER[1]

This is a business dispute between an insurance brokerage firm and its former employee. The court enters this memorandum opinion following a bench trial. Insofar as the measure of success is money, which party succeeds remains to be seen.

## I.  Standard of Review

A district court presiding over a bench trial decides the facts, which involves determining the credibility of witnesses and weighing the evidence, and then makes conclusions of law based on those facts. *See Sidman v. Travelers Cas. & Sur.*, 841 F.3d 1197, 1201 (11th Cir. 2016) (discussing standard of review applicable to district court's findings of fact and conclusions of law following bench trial). The party

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Docs. 37, 45). Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

prosecuting a claim bears the burden of proving each element of the claim to the court by a preponderance of the evidence. *Fire Ins. Exch. v. McCoy*, 637 F. Supp. 2d 991, 992 (M.D. Ala. 2009); *see also Aponte v. Brown & Brown of Fla., Inc.*, 806 F. App'x 824, 831 (11th Cir. 2020) (holding district court presiding over bench trial did not err in basing its conclusions on preponderance standard).

The court must "find the facts specially and state its conclusions of law separately," either "on the record after the close of the evidence" or "in an opinion or a memorandum of decision." FED. R. CIV. P. 52(a)(1). Although the court must find the facts "with enough specificity for a reviewing court to identify the factual findings upon which the court's legal conclusions are based," the court "need not state the evidence or any of the reasoning upon the evidence, nor assert the negative of rejected propositions." *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (internal quotation marks and citations omitted). A reviewing court "presume[s] that the judge considers all of the evidence, and relies on so much of it as supports the finding and rejects what does not support the finding, unless the judge states otherwise." *Western Pacific Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1285 (9th Cir. 1984) (quoted favorably in *Stock Equip. Co.*). In sum, " 'the judge need only make brief definite, pertinent findings and conclusions upon the contested matters; there is no necessity

for over-elaboration of detail or particularization of facts.'" *Stock Equip. Co.*, 906 F.2d at 592 (quoting FED. R. CIV. P. 52 advisory committee's note).

A reviewing court will not set aside a district court's findings of fact – including its determinations of the credibility of witnesses and weight of the evidence – unless they are clearly erroneous. *Sidman*, 841 F.3d at 1201. " 'In a case in which the evidence is largely testimonial . . . the district court has the advantage of observing the witnesses and evaluating their credibility firsthand, and the standard of review imposes an especially heavy burden on an appellant.'" *Id.* (quoting *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007)).

## II.    Findings of Fact

Mark Mullervy is an insurance broker based in Houston, Texas.  His area of expertise is brokering insurance policies to energy companies.  (Doc. 84 at pp. 117-19).   Cobbs, Allen & Hall, Incorporated, is an insurance brokerage firm headquartered in Birmingham, Alabama.  CAH Holdings, Inc., is the holding company for the brokerage firm's stock.  (Doc. 84 at p. 14).  The court will refer to Cobbs, Allen & Hall, Incorporated, as "Cobbs Allen" or "the brokerage firm," to CAH Holdings, Inc., as "CAH Holdings" or "the holding company," and to Cobbs Allen and CAH Holdings collectively as "the defendants."  Cobbs Allen recruited Mullervy to join the brokerage firm as a producer in July 2016 when it set out to build an energy practice in Houston.  (Doc. 84 at pp. 9, 14-16, 122-25).  A producer

is someone who generates new business opportunities for an insurance brokerage firm and services existing accounts. (Doc. 84 at p. 11). Many of the court's findings of fact rely on testimony Mullervy gave at trial. Mullervy was a credible witness generally. The specific testimony on which the court relies to make factual findings was credible not only for that reason, but also because it was corroborated by other evidence of record.

On becoming a Cobbs Allen employee, Mullervy entered into an employment agreement with the brokerage firm (the "Employment Agreement"). (Doc. 81-44). The Employment Agreement includes a duty of loyalty provision that requires an employee to avoid activities that create even the appearance of a conflict of interest during his employment. (Doc. 81-44 at ¶ 7(d)). It includes a non-solicitation provision that prohibits an employee from directly or indirectly soliciting the business of a Cobbs Allen client or talents of a Cobbs Allen employee during his employment and for a period thereafter. (Doc. 81-44 at ¶ 7(b)).[2] And it includes a confidentiality provision that prohibits an employee from disclosing to anyone outside the brokerage firm information about a Cobbs Allen client or "personnel information." (Doc. 81-44 at ¶ 6). The Employment Agreement provides for reasonable attorneys' fees to the "prevailing party" in an action to enforce, or recover

---

[2] Conduct within the scope of the non-solicitation provision includes merely accepting written instructions (a "broker of record" letter) from a Cobbs Allen client removing the brokerage firm as its broker of record and replacing it with a competitor. (Doc. 81-44 at ¶ 7(b)(4)).

damages for a breach of, the agreement.  (Doc. 81-44 at ¶ 13(d). It is governed by Alabama law.  (Doc. 81-44 at ¶ 13(c)).  To be clear, Cobbs Allen is the defendant that is party to the Employment Agreement.  (Doc. 81-44).

Mullervy was a successful producer for Cobbs Allen.  He generated a large volume of revenue for the brokerage firm.  (Doc. 84 at pp. 11-12, 17, 22-23; Doc. 85 at p. 82).  Within approximately 18 months of joining Cobbs Allen, Mullervy became a shareholder.  CAH Holdings offered Mullervy the "opportunity" to purchase 2,375 shares of stock for $500,000 – an offer he accepted – and granted him an additional 475 shares.  Mullervy financed a portion of his purchase with a loan from Compass Bank guaranteed by one or both of the defendants.  (Doc. 84 at pp. 23-28).

On acquiring the stock, Mullervy became subject to the Fourth Amended and Restated Restrictive Stock Transfer Agreement (the "RSTA").  (Doc. 81-1).  The RSTA requires CAH Holdings to redeem shares held by someone who ceases to be a Cobbs Allen employee for a reason other than death and gives the holding company two options for accomplishing redemption.  (Doc. 81-1 at ¶ 5).  CAH Holdings may purchase the shares in installments over five years (the "Redemption Period"), commencing on a date within 30 days of the shareholder's separation from Cobbs Allen if the separation occurs after May 31st of a given year (the "first Scheduled Redemption Date").  (Doc. 81-1 at ¶ 5(a)(i)).  Alternatively, CAH Holdings may

purchase the shares – all of them – on the first Scheduled Redemption Date by issuing a promissory note to the shareholder in the amount of the purchase price of the shares. The RSTA provides the note is payable two years and 45 days after the shareholder's separation from Cobbs Allen. (Doc. 81-1 at ¶ 5(a)(iv)).

The RSTA includes non-solicitation and confidentiality provisions similar in substance to the non-solicitation and confidentiality provisions included in the Employment Agreement. (*Compare* Doc. 81-1 at ¶¶ 12 and 13, *with* Doc. 81-44 at ¶¶ 6 and 7(b)). If CAH Holdings chooses to accomplish redemption by purchasing shares in installments and a shareholder violates the non-solicitation or confidentiality provision included in the RSTA before the holding company completes redemption, Paragraph 5(c) requires CAH Holdings to adjust the purchase price of the shares remaining to be purchased by the loss in value to Cobbs Allen of the shareholder's book of business. (Doc. 81-1 at ¶ 5(c)). If CAH Holdings chooses to accelerate redemption and a shareholder violates the non-solicitation or confidentiality provision included in the RSTA before the promissory note issued for the purchase price of his shares comes due, Paragraphs 5(a)(iv) and (c) give the holding company the right to offset the principal owed on the note by the loss in value to Cobbs Allen of the shareholder's book of business. (Doc. 81-1 at ¶¶ 5(a)(iv) and (c)).

The RSTA also includes a provision that allows CAH Holdings to determine, "prior to the end of the Redemption Period," that a shareholder should be treated as an employee terminated for good cause because, for example, he engaged in dishonesty, theft, or fraud or breached an agreement with Cobbs Allen or CAH Holdings. (Doc. 81-1 at ¶ 4(c)). If CAH Holdings has grounds to treat a shareholder as an employee terminated for good cause and elects to do so, the holding company must reduce "the purchase price of [the] [s]hares to be purchased" to the least of three values, including as relevant here the tangible book value of the shares. (Doc. 81-1 at ¶ 5(d)). The RSTA is governed by Delaware law. (Doc. 81-1 at ¶ 22(e)). To be clear, CAH Holdings is the defendant that is party to the RSTA. (Doc. 81-1).

Alliant is a Cobbs Allen competitor. (Doc. 85 at p. 90). John Ludwig, the Senior Managing Director and Co-Chief Operating Officer of Alliant, approached Mullervy in June 2019 about joining the company. (Doc. 84 at pp. 155-58; Doc. 93-1 at 4). Mullervy discussed the Alliant opportunity with Ludwig throughout the summer and early fall of 2019. (Doc. 84 at pp. 172-73). At some point during this period, Ludwig delivered a letter extending a formal offer of employment to Mullervy. The letter appears no longer to exist. (Doc. 84 at pp. 178-79; Doc. 85 at 290-91). Regardless of when Mullervy received an offer to join Alliant, formal or informal, he did not make the decision to accept the offer until September 30, 2019, the day before he resigned from Cobbs Allen. (Doc. 84 at pp. 159, 172; Doc. 85 at

pp. 54-57).  Mullervy tendered his resignation to Josh Kirklin, another producer in Cobbs Allen's Houston office, on the morning of October 1, 2019.  (Doc. 84 at p. 163).  Three Cobbs Allen employees who worked closely with Mullervy at the company – Shannon Westmoreland, Annette Griggs, and Jenna Daniels – left the brokerage firm for Alliant later that day.  (Doc. 85 at pp. 28-31).[3]

In the days following October 1, 2019, Alliant and Cobbs Allen negotiated an agreement for the release of Mullervy's covenants not to solicit the business of Cobbs Allen clients.  (Doc. 84 at p. 68; Doc. 85 at pp. 97-98, 114-16).  Pursuant to a document titled "Asset Purchase Agreement," effective October 1, 2019, Alliant paid Cobbs Allen approximately $4.5 million in exchange for the release of Mullervy's non-solicitation covenants in relation to 11 Cobbs Allen clients identified on Exhibit A to the agreement.  (Doc. 81-2; Doc. 85 at p. 98).  Those clients included Ridgewood Energy and Krewe Energy, which moved their business to Alliant on October 2, 2019, and Hi-Crush, which moved its business to Alliant on October 4, 2019.  (Doc. 81-2; Doc. 84 at pp. 180-81, 183-84).  The Asset Purchase Agreement explicitly contemplated neither Mullervy nor any other Alliant representative would solicit or accept the business of Cobbs Allen clients identified on Exhibit B to the agreement for a period of 18 months.  (Doc. 81-2).  Those clients included Alamo Palace, Whitney Oil & Gas, and possibly Cantium.  (Doc. 81-2).  The Asset Purchase

---

[3] Annette Griggs is now known as Annette Griggs Gordy, but the court will refer to her as "Griggs."

Agreement provides for an award of reasonable attorneys' fees to the "prevailing party" in an action to enforce the agreement.  (Doc. 81-2 at ¶ 21).  It is governed by Alabama law.  (Doc. 81-2 at ¶ 15).  To be clear, Cobbs Allen is the defendant that is party to the Asset Purchase Agreement.  (Doc. 81-2).

Mullervy's separation from Cobbs Allen required CAH Holdings to redeem the 2,850 shares of stock Mullervy held.  (*See generally* Doc. 81-1 at ¶ 5).  The holding company accomplished redemption by issuing Mullervy a promissory note for $1,185,942.00, payable on November 15, 2021.  (Doc. 40-5).  The original note was subordinated to other debt held by CAH Holdings.  (Doc. 40-5).  The holding company issued a new note to Mullervy after an arbitrator ordered it to eliminate the subordination provision.  (Doc. 81-4; Doc. 84 at p. 114).  The original and re-issued notes are the same in all other respects.  (*Compare* Doc. 40-5, *with* Doc. 81-4).  The court will refer to the re-issued note as the "Promissory Note" or the "Note." Paragraph 1 of the Note, titled "Effect of Stock Agreement," states the Note "is subject to the provisions [of] [the RSTA]."  (Doc. 81-4 at ¶ 1).  Paragraph 2 of the Promissory Note, titled "Payment," states payment on the Note is "[s]ubject in all respects to the terms and conditions of [Paragraphs] 2(b), 5(a)(iv) and 5(c) of the [RSTA]."  (Doc. 81-4 at ¶ 2).  The Note is governed by Alabama law.  (Doc. 81-4 at ¶ 5(a)).  To be clear, CAH Holdings is the defendant that is party to the Note.  (Doc. 81-4).

CAH Holdings delivered the original promissory note to Mullervy with a letter that put Mullervy on notice the holding company intended to reduce the principal owed on the note because it believed he had violated the non-solicitation and confidentiality provisions included in the RSTA. (Doc. 81-3). CAH Holdings also asserted there was a period following Mullervy's resignation during which the holding company could decide to treat him as an employee terminated for good cause and reduce the principal owed on the note to the tangible book value of his shares. (Doc. 81-3).

Five months later, Mullervy's former fiancée called the President of Cobbs Allen. (Doc. 85 at p. 101). Based on the call, the defendants began an investigation. (Doc. 85 at p. 102). In a letter dated October 8, 2020, CAH Holdings informed Mullervy it had decided to treat him as an employee terminated for good cause after becoming aware he had "expended [Cobbs Allen] funds, while still employed at Cobbs Allen, to entertain or solicit clients that [he] took with [him] to . . . Alliant" and had "expended [Cobbs Allen] funds, while purporting to be on [Cobbs Allen] business, when, in fact, [he] [was] not on [Cobbs Allen] business." (Doc. 81-5). The defendants later clarified in relation to the latter allegation that it believed Mullervy had expensed to Cobbs Allen personal trips, entertainment, and meals he had shared with his former fiancée. (*See, e.g.,* Doc. 88 at ¶ 14-15). In a letter dated October 29, 2021, CAH Holdings informed Mullervy that, because it had decided to

treat him as an employee terminated for good cause, it was reducing the principal owed on the Promissory Note to the tangible book value of his shares – $1, 223.71 – and applying that amount toward satisfaction of his indebtedness to Compass Bank.  (Docs. 81-6).  Mullervy got nothing.  (Doc. 84 at p. 114).[4]

He filed suit in the United States District Court for the Southern District of Texas on November 2, 2021, asserting a claim for breach of the Promissory Note. (Doc. 1).  The case was transferred to this district court on February 9, 2022, after which the defendants filed an answer and counterclaims for (1) breach of the Employment Agreement, (2) breach of the RSTA, (3) breach of the Asset Purchase Agreement, (4) a declaratory judgment the RSTA permitted CAH Holdings to treat Mullervy as an employee terminated for good cause and reduce the principal owed on the Promissory Note to the tangible book value of his shares, (5) conspiracy, and (6) spoliation.  (Docs. 25, 26, 40).

The defendants contend Mullervy breached the duty of loyalty provision included in the Employment Agreement, together with the non-solicitation and confidentiality provisions included in that agreement and the RSTA, by discussing existing and prospective Cobbs Allen clients with Ludwig and soliciting those clients to move their business to Alliant while he remained a Cobbs Allen employee.

---

[4] Mullervy challenges CAH Holding's calculation of the tangible book value of his shares.  The accuracy of the calculation turns out to be irrelevant to the parties' dispute.

Mullervy did not discuss existing or prospective Cobbs Allen clients with Ludwig or solicit those clients to move their business to Alliant while he remained a Cobbs Allen employee. (Doc. 84 at pp. 163-64; Doc. 85 at p. 71).

The defendants contend Mullervy breached the duty of loyalty provision included in the Employment Agreement, together with the non-solicitation and confidentiality provisions included in that agreement and the RSTA, by discussing the composition of his Cobbs Allen team with Ludwig and soliciting Westmoreland, Griggs, and Daniels to follow him to Alliant. Mullervy did not speak directly with Westmoreland, Griggs, or Daniels about following him to Alliant. However, Mullervy himself testified that in discussing the Alliant opportunity with Ludwig, he did tell Ludwig who worked closely with him at Cobbs Allen, leaving it up to Ludwig to decide what to do with that information. (Doc. 85 at pp. 31-32).[5]

The defendants contend Mullervy breached the non-solicitation provisions included in the Employment Agreement and RSTA, together with the Asset Purchase Agreement, by directing Alliant employees to contact Cobbs Allen clients after he resigned from Cobbs Allen. Cobbs Allen also contends Mullervy breached the Asset Purchase Agreement by soliciting Alamo-Palace, Whitney Oil & Gas, and Cantium himself during the restricted period. Mullervy did not direct Alliant

---

[5] Ludwig testified when deposed that he did not speak with Mullervy about who worked on his team at Cobbs Allen. (Doc. 93-1 at 23). The court credits the testimony Mullervy gave on this matter over that given by Ludwig.

employees to contact Cobbs Allen clients after he resigned from Cobbs Allen.  (Doc. 85 at pp. 33-34).  Alamo-Palace, Whitney Oil & Gas, and Cantium reached out to Mullervy during the restricted period.  Mullervy's response was limited in relevant part to providing those Cobbs Allen clients with his new professional contact information.  (Doc. 85 at pp. 14-17).

CAH Holdings principally contends the RSTA permitted the holding company to treat Mullervy as an employee terminated for good cause because Mullervy submitted expenses for reimbursement that constituted dishonesty, theft, or fraud.  It contends business expenses Mullervy incurred during the summer and early fall of 2019 constituted dishonesty, theft, or fraud because their purpose was to solicit existing and prospective Cobbs Allen clients to move their business to Alliant.  It contends Mullervy engaged in dishonesty, theft or fraud when he submitted personal expenses for reimbursement over the course of his employment with the brokerage firm.  And it contends Mullervy engaged in dishonesty, theft, or fraud when he prepaid for a Birmingham, Alabama, hotel room in July 2019 insofar as his intent was to impose on Cobbs Allen an expense of a trip he would take as an Alliant employee.

The purpose of the business expenses Mullervy incurred during the summer and early fall of 2019 was, in his own words, to continue doing his "level best to produce revenue for Cobbs Allen," not persuade existing or prospective Cobbs Allen

clients to replace the company with Alliant as their broker of record.  Stated more forcefully, "the entire time [he] worked for Cobbs Allen[,] [he] worked as hard as [he] possibly could to maximize the revenue for Cobbs Allen."  (Doc. 84 at p. 166; Doc. 85 at pp. 52-53, 58-67).  To the extent Mullervy submitted some personal expenses for reimbursement, he did so unintentionally, and any errors he made in the expense descriptions included with his requests for reimbursement were mistakes.  (Doc. 84 at pp. 167-72, 185-220, 225-33; Doc. 85 at pp. 19-22, 37-53). Mullervy did not prepay for the hotel room in July 2019 to impose on Cobbs Allen an expense of a trip he would take as an Alliant employee.  (Doc. 84 at pp. 165-66). He secured a better rate by prepaying for the room and expected to be in Alabama on Cobbs Allen business.  (Doc. 84 at p. 165, 222-23).[6]

Mullervy seeks compensatory damages in the amount of $1,326,422.33, representing principal and interest owed on the Promissory Note.  (Doc. 69 at pp. 1-2).  The defendants seek compensatory damages and punitive damages.  (Doc. 67 at pp. 1-3).  The only evidence of compensatory damages the defendants presented was the expenses they allege were dishonest or constituted theft or fraud.  The defendants' counsel clarified the relief they seek first and foremost is not compensatory damages, but rather a judgment the expenses entitled CAH Holdings

---

[6] The court did not need to make factual findings regarding Mullervy's expenses to dispose of Cobbs Allen's claim for declaratory judgment.  The court has done so to avoid leaving unsettled the question of Mullervy's integrity.

to treat Mullervy as an employee terminated for good cause and reduce the principal owed on the Promissory Note to the tangible book value of Mullervy's shares. (Doc. 84 at pp. 207-08). Finally, Mullervy and Cobbs Allen each seek attorneys' fees as the prevailing party under the Employment Agreement and Asset Purchase Agreement. (Doc. 67 at p. 3; Doc. 69 at p. 2). They state the prevailing party will prove its attorneys' fees after liability is established. (Doc. 67 at p. 3 n.1; Doc. 69 at p. 2). Cobbs Allen previewed for the court that its attorney's fees incurred through March 17, 2023, totaled $347,823.43. (Doc. 67 at p. 3).

## III. Conclusions of Law

### A. Defendants' Conspiracy Claim

The court will enter judgment in Mullervy's favor on the defendant's conspiracy claim. A conspiracy is the combination of two or more persons to commit a wrong. *Keith v. Witt Auto Sales, Inc.*, 578 So. 2d 1269, 1274 (Ala. 1991). The conspiracy does not exist in the absence of the underlying wrong. *Goolesby v. Koch Farms, LLC*, 955 So. 2d 422, 430 (Ala. 2006). The wrongs asserted by the defendants in their counterclaim are Mullervy's alleged contractual breaches. (Doc. 40 at ¶ 56).[7] Setting aside for now the question of whether Mullervy committed a contractual breach, the Alabama Supreme Court has indicated a breach of contract

---

[7] The defendants allege Mullervy conspired with Alliant "and others" to commit the breaches. (Doc. 40 at ¶ 56).

cannot be the wrong that forms the basis of a civil conspiracy. *Barber v. Stephenson*, 69 So. 2d 251, 255 (Ala. 1953); *Hooper v. Columbus Reg'l Healthcare Sys., Inc.*, 956 So. 2d 1135, 1141-42 (Ala. 2006); *see also Ponder v. Lake Forest Prop. Owners Ass'n*, 214 So. 3d 339, 347 (Ala. Civ. App. 2015). Even if there could be a conspiracy to breach a contract, the defendants have abandoned their conspiracy claim. They did not address the claim at trial or in their pre- or post-trial briefing. *See Blue Cross and Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990) (holding district court does not bear burden of "distill[ing] any possible argument which could be made based on the materials before the court"); *Norelus v. Denny's, Inc.*, 628 F.3d 1270, 1296-97 (11th Cir. 2010) (noting law is well-settled that legal claim or argument not briefed before appellate court is deemed abandoned and will not be addressed); *Tucker v. City of Florence, Ala.*, 765 F. Supp. 2d 1320, 1332 (N.D. Ala. 2011) (applying rule of *Norelus* at district court level and deeming claims pleaded in complaint but not briefed on summary judgment to have been abandoned).

### B. Defendants' Spoliation Claim

The court will enter judgment in Mullervy's favor on the defendants' spoliation claim. There is not an independent cause of action for spoliation under the law of most states. *See, e.g., Christian v. Kenneth Chandler Const. Co.*, 658 So. 2d 408, 413 (Ala. 1995); *Lucas v. Christiana Skating Ctr., Ltd.*, 722 A.2d 1247,

1248-50 (Del. Super. Ct. 1998); *Trevino v. Ortega*, 969 S.W.2d. 950, 951-52 (Tex. 1998). Spoliation generally is an evidentiary issue and, in the context of a federal lawsuit, a matter of federal law. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005), *superseded in part by rule as stated in Skanska USA Civil Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290 (11th Cir. 2023).[8] Federal law defines spoliation as " 'the destruction of evidence or the significant and meaningful alteration of a document or instrument.'" *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1184 (11th Cir. 2020) (quoting *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1308 (11th Cir. 2003)). The remedy for spoliation is sanctions, and an appropriate sanction may be an inference the spoliated evidence would have been unfavorable to the spoliator. *Id.*

A variety of factors may affect the decision whether to impose sanctions for spoliation. Always critical to the inquiry is whether the alleged spoliator acted in bad faith. Spoliation sanctions – "and in particular adverse inferences" – cannot be imposed absent a finding of bad faith. *Id.* at 1183-84. A party's anticipation of litigation, standing alone, does not prove bad faith. *See id.* at 1183 ("[A]nticipation of litigation is not the standard for spoliation sanctions – bad faith is."). In the context of spoliation, bad faith "generally means destruction for the purpose of

---

[8] The Eleventh Circuit held in *Skanska* that Rule 37(e) supplants the "*Flury* factors" – the factors discussed in *Flury* as relevant to the spoliation analysis – insofar as a party seeks sanctions for the spoliation of electronically-stored information. *See Skanska*, 75 F.4th at 1312 n.18.

hiding adverse evidence.'"  *Id.* (quoting *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015)).  " 'Mere negligence' in losing or destroying [] records is not enough for an adverse inference [because] 'it does not sustain an inference of consciousness of a weak case.'"  *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) (quoting *Vick v. Tex. Emp. Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).  The party seeking spoliation sanctions bears the burden of proving bad faith.  *Managed Care Sols., Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1322 (S.D. Fla. 2010).

The object of the defendants' spoliation claim is the offer letter Mullervy received from Ludwig.  The defendants seek an inference the letter would have established Mullervy decided no later than July 1, 2019, to leave Cobbs Allen.  (Doc. 79 at pp. 1-2; Doc. 88 at pp. 23-24).  The defendants are not entitled to the inference because they failed to prove Mullervy discarded the letter for the purpose of hiding evidence that would have placed him in legal jeopardy.  There is no direct evidence Mullervy acted with the requisite intent, and to the extent circumstantial evidence exists, it falls short of preponderating in favor of a finding of bad faith.[9]

---

[9] The court is far from convinced the offer letter would have buoyed the defendants' claims.  *See Eli Lilly and Co. v. Air Express Int'l USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010) (noting spoliation analysis "hinges upon the significance of the evidence and the prejudice suffered as a result of its destruction") (citing *Flury*, 427 F.3d at 943).  An offer of employment, even a formal one, is just that: an offer, capable of acceptance or rejection.  Mullervy credibly testified he did not make the decision to join Alliant until September 30, 2019.  Even if he had made the decision on an earlier date, the court questions whether that fact would show disloyalty or dishonesty when Mullervy credibly testified he worked to further the interests of Cobbs Allen up until his resignation on October 1, 2019.

### C.    Defendants' Breach of Contract Claims

The court will award Cobbs Allen and CAH Holdings each nominal damages in the amount of $1.00 in relation to their breach of contract claims.  Those claims involve the Employment Agreement, RSTA, and Asset Purchase Agreement.  The Employment Agreement and Asset Purchase Agreement are governed by Alabama law.  (Doc. 81-44 at ¶ 13(c); Doc. 81-2 at ¶ 15).  The RSTA is governed by Delaware law.  (Doc. 81-1 at ¶ 22(e)).  The common elements of a claim for breach of contract under Alabama and Delaware law are (1) the existence of a valid contract, (2) a breach of the contract, and (3) damages resulting from the breach of contract. *Dupree v. PeoplesSouth Bank*, 308 So. 3d 484, 490 (Ala. 2020); *Connelly v. State Farm Mut. Auto. Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016).  Alabama law additionally requires the party asserting a breach of contract claim to demonstrate its own performance under the contract.  *Dupree*, 308 So. 3d at 490.

Where a claim for breach of contract requires contract interpretation, a court must give the words used in the contract their plain, ordinary meaning unless the contract manifests another intention.  *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 36 (Ala. 1998); *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).  The plain, ordinary meaning of a term often is articulated as " 'the meaning a person of ordinary intelligence would reasonably give it,'" *Hall v. Env't Litig. Grp., P.C.*, 248 So. 3d 949, 959 (Ala. 2017) (quoting *Safeway Ins. Co. of Alabama,*

*Inc. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005)), or "what a reasonable person in the position of the parties would have thought it meant," *AT&T Corp. v. Lillis*, 953 A.2d 241, 252-53 (Del. 2008).  A court may refer to a dictionary to determine the plain, ordinary meaning of a term.  *See Once Upon a Time, LLC v. Chappelle Props., LLC*, 209 So. 3d 1094, 1098 (Ala. 2016) (referring to dictionary to determine plain, ordinary meaning of words used in contract); *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738, 740 (Del. 2006) (explaining it is "well-settled" under Delaware law that "[w]hen a [contract] term's definition is not altered or has no 'gloss' in the relevant industry it should be construed in accordance with its ordinary dictionary meaning") (internal quotation marks omitted and alteration adopted).  "This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." *Lorillard Tobacco Co.*, 903 A.2d at 738; *see also Carpet Installation and Supplies of Glenco v. Alfa Mut. Ins. Co.*, 628 So. 2d 560, 562 (Ala. 1993) (holding circuit court properly interpreted contract term by reference to dictionary because dictionary definition provided meaning that ordinary person would have given word).  A technical term or term of art used in a technical context should not be given its plain, ordinary meaning but, rather, its technical meaning.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 202 (1981) ("Unless a different intention is manifested . . . technical terms and words of

art are given their technical meaning when used in a transaction within their technical field."); *In re P3 Health Grp. Holdings, LLC*, 282 A.3d 1054, 1067 (Del. Ch. 2022) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202); *cf. Dan Tucker Auto Sales*, 718 So. 2d at 36 ("Words used in a contract will be given their ordinary, plain, or natural meaning where nothing appears to show they were used in a different sense or that they have a technical meaning.").

A court must enforce an unambiguous contract as written, even if the result seems harsh. *See Dan Tucker Auto Sales*, 718 So. 2d at 35 ("General contract law requires a court to enforce an unambiguous, lawful contract, as it is written. A court may not make a new contract for the parties or rewrite their contract under the guise of construing it.") (internal citations omitted); *Lilley v. Gonzales*, 417 So. 2d 161, 163 (Ala. 1982) ("Where a contract is unambiguous and plain in expression, we know of no cannon of construction that warrants an interpretation the only effect of which is to relieve a party to the contract from consequences deemed by him hard or unfair. Where the parties express without ambiguity their intention, no court can alter the agreement, and no room for judicial construction is left."). If a breach is established, a court must award the non-breaching party nominal damages even if the party fails to prove compensatory damages. *See Knox Kershaw, Inc. v. Kershaw*, 552 So. 2d 126, 128 (Ala. 1989) ("It is well settled . . . that once a breach of contract has been established . . . the nonbreaching party is entitled to nominal damages even

21

if there was a failure of proof regarding actual damages."); *James S. Kemper & Co. Se. v. Cox & Assocs., Inc.*, 434 So. 2d 1380, 1385 (Ala. 1983) ("When the evidence establishes a breach, even if only technical, there is nothing discretionary about the award of nominal damages."); *Ivize of Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009) (noting nominal damages are available under Delaware law where contract is breached but compensatory damages cannot be or have not been demonstrated). "Nominal damages are not based on the extent of any loss sustained as a result of the breach but are awarded in recognition of the invasion of the legal rights of the plaintiff." *Roberson v. C.P. Allen Const. Co.*, 50 So. 3d 471, 477 (Ala. Civ. App. 2010) (citing *Avis Rent A Car Sys., Inc. v. Heilman*, 876 So. 3d 1111, 1120 (Ala. 2003)); *see also USH Ventures v. Global Telesystems Grp., Inc.*, 796 A.2d 7, 23 (Del. Super. Ct. 2000) (" 'Nominal damages are not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff.'") (quoting DAVID L. FINGER & LOUIS J. FINGER, DELAWARE TRIAL HANDBOOK, § 22:1 (1994)). They are "intended to be a " *trifling* sum,'" *Roberson*, 50 So. 3d at 478 (quoting an unspecified definition in BLACK'S LAW DICTIONARY 418 (8th ed. 2004)) (emphasis added in *Roberson*), or a "*trivial* amount," *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005) (emphasis added). It is possible for an award of nominal damages to support an

award of punitive damages, at least under Alabama law. *See Life Ins. Co. of Ga. v. Smith*, 719 So. 2d 797, 806-07 (Ala. 1998) (discussing circumstances under which award of nominal damages will support award of punitive damages). However, the possibility does not extend to circumstances where nominal damages are awarded for a breach of contract. Punitive damages ordinarily are not recoverable for a breach of contract. *Corson v. Universal Door Sys., Inc.*, 596 So. 2d 565, 572 (Ala. 1991); *Bhole, Inc. v. Shore Invs.*, 67 A.3d 444, 454 (Del. 2013).

The defendants contend Mullervy breached the duty of loyalty provision included in the Employment Agreement, together with the non-solicitation and confidentiality provisions included in that agreement and the RSTA, by discussing existing and prospective Cobbs Allen clients with Ludwig and soliciting those clients to move their business to Alliant while he remained a Cobbs Allen employee. They contend Mullervy breached the same provisions by discussing the composition of his Cobbs Allen team with Ludwig and soliciting Westmoreland, Griggs, and Daniels to follow him to Alliant. Finally, they contend Mullervy breached the non-solicitation provisions included in the Employment Agreement and RSTA, together with the Asset Purchase Agreement, by directing Alliant employees to contact Cobbs Allen clients after he resigned from Cobbs Allen and by soliciting the business of Alamo-Palace, Whitney Oil & Gas, and Cantium himself during the restricted period.

Mullervy did not discuss existing or prospective Cobbs Allen clients with Ludwig or solicit those clients to move their business to Alliant while he remained a Cobbs Allen employee.  He did not direct Alliant employees to contact Cobbs Allen clients after he resigned from Cobbs Allen.[10]  And he did not solicit Alamo-Palace, Whitney Oil & Gas, or Cantium during the restricted period, unless responding to client-initiated communications with new professional contact information constitutes solicitation.  The court concludes it does not.

The Asset Purchase Agreement does not define "solicitation."  Whether given its plain, ordinary meaning or the meaning assigned to it in a business context, solicitation does not encompass the mere provision of new professional contact information in response to client-initiated communications.  *See, e.g., Solicit*, https://dictionary.cambridge.org/dictionary/english/solicit (last visited March 15, 2024) (defining the verb generally to mean "to ask for something in a persuasive and determined way" and, in a business context, to mean "to contact possible customers in order to sell a product").  The defendants direct the court to interpretations of solicitation in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Schultz*, 2001 WL 1681973 (D.D.C. Feb. 26, 2001); *Compass Bank v. Hartley*, 430 F. Supp. 2d 973 (D.

---

[10] To the extent Mullervy, after resigning from Cobbs Allen on October 1, 2019, directed an Alliant employee to contact a Cobbs Allen client that appeared on Exhibit A to the Asset Purchase Agreement, that would not have violated the Employment Agreement, RSTA, or Asset Purchase Agreement.  The Asset Purchase Agreement released Mullervy from his non-solicitation covenants in relation to the Cobbs Allen clients identified on Exhibit A to the agreement.

Ariz. 2006); and *Digitel Corp. v. Deltacom, Inc.*, 953 F. Supp. 1486 (M.D. Ala. 1996). (Doc. 88 at 22). The interpretations of solicitation in those cases does not encompass the mere provision of new professional contact information in response to client-initiated communications, either. In *Schultz* and *Hartley*, the courts held resignation announcements containing new contact information constituted solicitation. *See Schultz*, 2001 WL 1681973, at *3; *Hartley*, 430 F. Supp. 2d at 981-82. In both cases, the solicitors initiated contact with the clients. That was a fact emphasized by the courts. *See Schultz*, 2001 WL 1681973, at *3 (describing solicitor's "initiation of targeted contact" and "intrusive, proactive communication"); *Hartley*, 430 F. Supp. 2d at 981 (characterizing letter announcing resignation as "a targeted mailing"). In *Digitel Corp.*, the court acknowledged solicitation could occur even absent initiation of contact by the solicitor. 953 F. Supp. at 1497 n.10. It held the provision of a quote or preparation of a bid in response to a customer request constituted solicitation. *Id.* Mullervy did not initiate contact with Alamo-Palace, Whitney Oil & Gas, or Cantium for the purpose of providing his new contact information or, in response to a request from one of those Cobbs Allen clients, provide a quote or prepare a bid to obtain its business. He merely provided his new professional contact information to Alamo-Palace, Whitney Oil & Gas, and Cantium after they initiated contact with him. The contrast between that conduct and the conduct at issue in *Schultz*, *Hartley*, and *Digitel Corp.*

is material.  The result of the contrast is that the cases cited by the defendants do more to undercut their claim of solicitation than to support it.

Mullervy did not speak directly with Westmoreland, Griggs, or Daniels about following him to Alliant.  However, he did tell Ludwig who worked closely with him at Cobbs Allen.  This was a technical breach of at least the confidentiality provisions included in the Employment Agreement and RSTA.  Those provisions prohibited Mullervy from disclosing Cobbs Allen "personnel information" to anyone outside the brokerage firm.  Neither the Employment Agreement nor the RSTA defines "personnel information."  Given its plain, ordinary meaning, the term "personnel information" includes the identities of employees who work closely together on a team.  *See, e.g., Personnel*, https://dictionary.cambridge.org/dictionary/english/personnel (last visited March 15, 2024) (defining the term as "the people who are employed in a company, organization, or one of the armed forces"); *Information*, https://dictionary.cambridge.org/dictionary/english/information (last visited March 15, 2024) (defining the term as "facts about a situation, person, event, etc.").[11]

---

[11] Mullervy attempted to draw a distinction between speaking directly with his Cobbs Allen colleagues about following him to Alliant, which he emphasized he did not do, and telling Ludwig who worked closely with him at Cobbs Allen, which he readily conceded he did do.  The tenor of that testimony suggested to the court that Mullervy believed his contractual obligations prohibited the former conduct but not the latter.  The court accepts that Mullervy thought he was abiding by his contractual obligations, but good faith is not a defense to a breach of the Employment Agreement or RSTA.

While the testimony received at trial requires the court to conclude Mullervy committed a technical breach of the confidentiality provisions included in the Employment Agreement and RSTA when he disclosed the identities of his close Cobbs Allen colleagues to Ludwig, the defendants failed to prove compensatory damages resulting from the breach.  The defendants suggest the damages they incurred as a result of the breach flowed from the defection of Westmoreland, Griggs, and Daniels to Alliant.  (*See, e.g.,* Doc. 88 at p. 19).  However, they have not attempted to quantify those damages.  Despite this failure of proof, the court still must award the defendants nominal damages.  As indicated by the word "must," a court lacks discretion to deny an award of nominal damages where a breach of contract has been established, at least under Alabama law.  *See James S. Kemper & Co. Se.* (discussed *supra*).  Nominal damages in the collective amount of $2.00 are sufficient to recognize the technical breaches established by Mullervy's testimony.  Cobbs Allen will recover nominal damages in the amount of $1.00 as the party to the Employment Agreement, and CAH Holdings will recover nominal damages in the amount of $1.00 as the party to the RSTA.  Although the defendants also request punitive damages, they have not articulated a basis for deviating from the general rule that punitive damages are not available for a breach of contract.  Therefore, the court will not award the defendants punitive damages.

### D.      CAH Holdings's Claim for Declaratory Judgment

The court will enter judgment in Mullervy's favor on CAH Holdings's claim seeking a declaration the RSTA permitted the holding company to treat Mullervy as an employee terminated for good cause and reduce the principal owed on the Promissory Note to the purported tangible book value of the shares it redeemed from him.  The court will do so based solely on construction of the RSTA.  Where, as here, CAH Holdings elects to accelerate redemption under Paragraph 5(a)(iv) of the RSTA and issue a promissory note to a shareholder on the first Scheduled Redemption Date in the amount of the purchase price for his shares, the RSTA does not allow the holding company later to treat the shareholder as an employee terminated for good cause under Paragraph 4(c) and reduce the principal owed on the note to the tangible book value of the redeemed shares under Paragraph 5(d).  More succinctly, the RSTA does not permit CAH Holdings to invoke Paragraph 4(c) and 5(d) after accelerating redemption under Paragraph 5(a)(iv).

The RSTA gives CAH Holdings two options for redeeming shares held by a former, still-living employee.  Under Paragraph 5(a)(i), the holding company can redeem the shares in installments over five years – termed the "Redemption Period" – commencing on a date within 30 days of the shareholder's separation from Cobbs Allen if the separation occurs after May 31st of a given year – termed the "first Scheduled Redemption Date."  Alternatively, the holding company can accelerate

redemption under Paragraph 5(a)(iv) and issue a promissory note to the shareholder on the First Scheduled Redemption Date in the amount of the purchase price of his shares.

If CAH Holdings chooses to accomplish redemption by purchasing shares in installments and a shareholder violates the non-solicitation or confidentiality provision included in the RSTA before the holding company completes redemption, Paragraph 5(c) requires CAH Holdings to adjust the purchase price of the shares remaining to be purchased by the loss in value to Cobbs Allen of the shareholder's book of business.  (Doc. 81-1 at ¶ 5(c)).  If CAH Holdings chooses to accelerate redemption and a shareholder violates the non-solicitation or confidentiality provision included in the RSTA before the promissory note issued for the purchase price for his shares comes due, Paragraphs 5(a)(iv) and (c) give the holding company the right to offset the principal owed on the note by the loss in value to Cobbs Allen of the shareholder's book of business.

Paragraph 4(c) of the RSTA allows CAH Holdings to determine a shareholder should be treated as an employee terminated for good cause because, for example, he engaged in dishonesty, theft, or fraud or breached an agreement with Cobbs Allen or CAH Holdings.  It imposes a deadline for CAH Holdings to make the determination: the end of the Redemption Period.  Paragraph 5(d) of the RSTA provides that, if CAH Holdings has grounds to treat a shareholder as an employee

terminated for good cause and elects to do so, the holding company must reduce "the purchase price of [the] [s]hares to be purchased" to the least of three values, including as relevant here their tangible book value.

Read together, these provisions of the RSTA make clear Paragraphs 4(c) and 5(d) apply when CAH Holdings chooses to accomplish redemption by purchasing shares in installments but not when the holding company accelerates redemption and issues a promissory note to a shareholder on the first Scheduled Redemption Date in the amount of the purchase price of his shares.   The starting point for this interpretation is the plain language of Paragraphs 4(c) and 5(d) and, more particularly, the identification of the end of the Redemption Period in Paragraph 4(c) as the deadline for determining a shareholder should be treated as an employee terminated for good cause and the use of the future tense in Paragraph 5(d).   The Redemption Period is defined as the five-year period for redemption in installments under Paragraph 5(a)(i).   There is no Redemption Period if CAH Holdings chooses to accelerate redemption under Paragraph 5(a)(iv).   Redemption is commenced and completed on the first Scheduled Redemption Date.   Similarly, there are no "[s]hares to be purchased" after CAH Holdings issues a promissory note under Paragraph 5(a)(iv).   All shares have been purchased when the note is issued.

Paragraph 5(a)(iv) supports this interpretation.   *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 913014 (Del. 2017) ("In

giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."); *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 342 (Del. 2022) (referring to other provisions of contract to determine meaning of term).  That paragraph, which establishes the option for CAH Holdings to accelerate redemption, expressly references the right to offset the principal owed on a promissory note by the loss in value to Cobbs Allen of the shareholder's book of business but does not mention a right to reduce the principal to the tangible book value of the shares purchased after determining the shareholder should be treated as an employee terminated for good cause.  The express inclusion of the former implies the exclusion of the latter.  *See Expressio Unius Est Exclusio Alterius*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining phrase as "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative"); *McDonald's Corp. v. Easterbrook*, 2021 WL 351967, at *5, *5 n.42 (Del. Ch. Feb. 2, 2021) (drawing parallel between the canon of construction, characterized as a statutory canon, and the court's conclusion the incorporation of certain provision of one contract into another permitted the inference other provisions of the contract were deliberately omitted).  The Promissory Note supports this interpretation for the same reason. Paragraph 2 of the Note, titled "Payment," states payment on the Note is "[s]ubject in all respects to the terms and conditions of [Paragraphs] 2(b), 5(a)(iv) and 5(c) of

the [RSTA]." The express inclusion of the reference to Paragraph 5(a)(iv) and (c) of the RSTA in the paragraph of the Promissory Note addressing payment, without mention of Paragraph 5(d) of the RSTA, implies Paragraph 5(d) does not apply to payment on the Note.

### E.     Mullervy's Claim for Breach of the Promissory Note

The court will require the parties to submit additional briefing in relation to Mullervy's claim for breach of the Promissory Note and reserves ruling on the claim until it has reviewed the briefing.

A promissory note is a form of contract. General contract principles govern the construction of a promissory note. *Bockman v. WCH, L.L.C.*, 943 So. 2d 789, 795 (Ala. 2006). Likewise, the elements of a claim for breach of a promissory note are the same as those for a breach of contract. *See PNC Bank Nat'l Ass'n v. MWM, Inc.*, 2015 WL 12834339, at *2 (S.D. Ala. Mar. 2, 2015). Under Alabama law, which governs the Promissory Note, those elements are: (1) the existence of a valid contract, (2) the plaintiff's performance under the contract, (3) the defendant's non-performance, and (4) damages resulting from the breach. *Dupree*, 308 So. 3d at 490.

Mullervy claims CAH Holdings breached the Promissory Note by failing to pay him the face value of the Note – $1,185,942.00 – together with interest. The parties agree the Promissory Note is a valid contract, and the court has concluded CAH Holdings was not permitted to treat Mullervy as an employee terminated for

good cause and reduce the principal owed on the Note to the tangible book value of his shares. The court also has concluded Mullervy breached the confidentiality provision included in the RSTA when he disclosed the identities of his close Cobbs Allen team members to Ludwig. That conclusion implicates the right of setoff articulated in Paragraph 5(a)(iv) and (c) of the RSTA and expressly referenced in Paragraph 2 of the Promissory Note. Paragraph 5(a)(iv) and (c) of the RSTA gives CAH Holdings the right to offset the principal owed on a promissory note by the loss in value to Cobbs Allen of a shareholder's book of business, if the shareholder violates the confidentiality provision included in the RSTA before the note comes due. However, CAH Holdings has not sought to exercise that right. It has not invoked the right in its submission to the court or submitted evidence quantifying the loss in value to Cobbs Allen of Mullervy's book of business.

The court has considered the possibility the disclosure Mullervy made to Ludwig prevents Mullervy from proving his own performance under provisions of the RSTA incorporated into the Promissory Note and that, consequently, his claim for breach of the Note fails outright. The court has considered the possibility the disclosure prevents Mullervy from proving performance sufficient to recover the face value of the Promissory Note but that he is entitled to recover nominal damages for CAH Holdings's failure to calculate the offset against the principal owed on the

Note in compliance with Paragraph 5(a)(iv) and (c).[12]   Finally, the court has

considered the possibility the disclosure is not a failure of performance *per se* but,

rather, simply an event that triggered a right of setoff CAH Holdings had but did not

exercise, leaving it indebted to Mullervy in the amount of $1,185,942.00 plus

interest.  The court has been unable to locate authority that clearly settles the question

before it.  The court is prepared to answer the question but first will afford the parties

the opportunity to submit their own views.

### F.    Attorneys' Fees

Cobbs Allen and Mullervy each seek to recover attorneys' fees under the

Employment Agreement and the Asset Purchase Agreement.[13]   The entitlement of a

party to attorneys' fees under each agreement turns on whether the party is the

"prevailing party."   Neither agreement defines "prevailing party."   The words

constitute a legal term of art.  *See Buckhannon Bd. and Care Home, Inc. v. W.V.*

*Dep't of Health and Hum. Res.*, 532 U.S. 598, 603 (2001) (analyzing the legal term

of art as used in the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. §

1988).  The court therefore construes the term consistent with its ordinary usage in

---

[12] There is no evidence Mullervy would have recovered something more than nothing if CAH Holdings had offset the principal owed on the Promissory Note by the loss in value to Cobbs Allen of his book of business rather than reduce the principal to the tangible book value of his shares.

[13] Alabama follows the "American Rule," which generally requires each party to pay its own attorney's fees.  *Union Fid. Life Ins. Co. v. McCurdy*, 781 So. 2d 186, 189 (Ala. 2000).  One exception to the rule arises when a contractual fee-shifting provision applies.  *Jones v. Regions Bank*, 25 So. 3d 427, 442 (Ala. 2009).

the legal field.  *See* RESTATEMENT (SECOND) OF CONTRACTS § 202 (discussed *supra*);

*Dan Tucker Auto Sales*, 718 So. 2d at 36 (same).  Persuasive case law and secondary

authority describe a prevailing party as "a party in whose favor a judgment is

rendered."  *See Party*, BLACK'S LAW DICTIONARY (11th ed. 2019); *Buckhannon*, 532

U.S. at 603 (quoting same definition included in earlier edition of the legal

dictionary).  Where the party in whose favor a judgment is rendered is the party

prosecuting a claim for compensatory damages, the party is considered to have

prevailed even if it recovers no more than nominal damages.  *See Tex. State Tchrs.*

*Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 790 (1989) (noting in the context

of a fee award under § 1988 that "the degree of the plaintiff's success in relation to

the other goals of the lawsuit" does not affect the plaintiff's eligibility for a fee award

"at all"); *cf. Party*, BLACK'S LAW DICTIONARY (11th ed. 2019) (noting "a party in

whose favor a judgment is rendered" is the prevailing party "regardless of the

amount of damages awarded"); *Buckhannon*, 532 U.S. at 603 (quoting same

definition included in earlier edition of the legal dictionary).

The limited success of a party that seeks compensatory damages but obtains

only nominal damages does not preclude the party from being identified as the

prevailing party, but it does bear on the fees awarded.  The Employment Agreement

and Asset Purchase Agreement each impose a "reasonableness" limitation on a fee

award.  (Doc. 81-2 at ¶ 21; Doc. 81-44 at ¶ 13(d)).  The court would be required to

limit an award to fees that are reasonable even absent inclusion of a reasonableness limitation in the agreements. *See Willow Lake Residential Ass'n, Inc. v. Juliano*, 80 So. 3d 226, 241 (Ala. 2010) ("Alabama law reads into every agreement allowing for the recovery of attorney's fees a reasonableness limitation."). "The reasonableness of any attorney fee under a contract providing for the recovery of reasonable attorney fees is largely within the discretion of the trial court." *Lanier v. Moore-Handley, Inc.*, 575 So. 2d 83, 85 (Ala. 1991). One of the factors the Alabama Supreme Court has identified as relevant to the determination of the reasonableness of an award of attorneys' fees provided for by contract is "the measure of success achieved." *Kiker v. Prob. Ct. of Mobile Cnty.*, 67 So. 3d 865, 867 (Ala. 2010).

The United States Supreme Court has emphasized the importance of this factor to the determination of the reasonableness of a fee award to the prevailing party in a federal civil rights suit. *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) (explaining "the most critical factor" in determining a reasonable fee award under § 1988 is "the degree of success obtained"); *see also McCurdy*, 781 So. 2d at 192 (explaining that in the context of the determination whether a fee award to class counsel was reasonable, the measure of success achieved "is an extremely important factor that must be examined with close scrutiny when the benefit to the class is extremely low"). The Court has observed the factor is so important that, "[i]n some circumstances, even a plaintiff who formally 'prevails' under § 1988 should receive

36

no attorney's fees at all." *Farrar v. Hobby*, 506 U.S. 103, 115 (1992).  "A plaintiff who seeks compensatory damages but receives no more than nominal damages is often such a prevailing party." *Id.*  "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all." *Id.* (internal citation omitted).

In relation to the claim asserted by Cobbs Allen against Mullervy under the Asset Purchase Agreement, Mullervy is the prevailing party.  Mullervy successfully defended the claim.  Cobbs Allen will not obtain any relief relative to the Asset Purchase Agreement.  In relation to the claim asserted by Cobbs Allen against Mullervy under the Employment Agreement, Cobbs Allen is the prevailing party. The brokerage firm alleged Mullervy breached the Employment Agreement in multiple ways.  It largely failed to prove these allegations.  But the testimony received at trial requires the court to conclude a technical breach of the confidentiality provision included in the Employment Agreement occurred when Mullervy disclosed the identities of his close Cobbs Allen colleagues to Ludwig. Cobbs Allen did not prove any compensatory damages suffered because of the breach, but the court is required to award the brokerage firm nominal damages to acknowledge the breach.  This success, albeit limited, entitles Cobbs Allen to prevailing party status under the Employment Agreement.

The court will establish a deadline for the parties to submit their formal fee

requests.  The court expects that the limited nature of Cobbs Allen's success in obtaining relief relative to the Employment Agreement will substantially affect the fees awarded.

## IV.    Conclusion

For the reasons stated above, the court will enter judgment in Mullervy's favor on the defendants' claims for conspiracy, spoliation, and declaratory judgment.  The court will enter judgment in the defendants' favor on their breach of contract claims only to the extent it will award Cobbs Allen and CAH Holdings each nominal damages in the amount of $1.00 for Mullervy's disclosure of the identities of his Cobbs Allen team members to Mullervy.  The court will otherwise enter judgment in Mullervy's favor on the defendants' breach of contract claims.

The court **DIRECTS** Mullery and CAH Holdings to submit briefs regarding the question the court has raised in relation to Mullervy's claim for breach of the Promissory Note on or before April 15, 2024.  The briefs should be limited to the question presented and not be used to reargue claims the court has adjudicated.

The court **DIRECTS** Mullervy and Cobbs Allen to submit their requests for attorneys' fees on or before April 15, 2024, as well.  The court advises the parties "[a] request for attorney's fees should not result in a second major litigation."  *See Hensley*, 461 U.S. at 437.

**DONE** this 15th day of March, 2024.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE